## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NOORAH BASHER,

           Plaintiff,

vs.

LEXISNEXIS RISK SOLUTIONS, INC.,
           Defendant.

Case No.: 1:24-mi-99999

**JURY TRIAL DEMANDED**

## COMPLAINT

Noorah Basher ("Plaintiff" or "Ms. Basher") brings this action on an individual basis, against LexisNexis Risk Solutions, Inc. ("Defendant" or "LNRS") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's consumer file with another consumer.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual

consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' insurance claims histories, credit histories, and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., insurers, retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals

who may be applying for insurance, retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.     Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

>     (d)    There is a need to ensure that consumer reporting agencies
>            exercise their grave responsibilities with fairness, impartiality,
>            and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the
> establishment of all sorts of computerized data banks, the individual is
> in great danger of having his life and character reduced to impersonal
> "blips" and key-punch holes in a stolid and unthinking machine which
> can literally ruin his reputation without cause, and make him
> unemployable or uninsurable, as well as deny him the opportunity to
> obtain a mortgage or buy a home. We are not nearly as much concerned
> over the possible mistaken turn-down of a consumer for a luxury item
> as we are over the possible destruction of his good name without his

knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with

fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.    A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.    A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.    "Mixed files" create a false description and representation of a consumer's credit history.

17.    The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.    Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.    More recently, non-party Experian, a consumer reporting agency, has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.    For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.    Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

22.    Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

23.    FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

24.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

25.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite

the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's

disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

29.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

30.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

31.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed files remain a significant problem for innocent consumers, including Plaintiff.

32.    Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's file with that of a different consumer.

33.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

34.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

35.     Noorah Basher ("Plaintiff" or "Ms. Basher") is a natural person residing in Atlanta, Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

36.     Defendant LexisNexis Risk Solutions, Inc. ("Defendant" or "LNRS") is a corporation with a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005, and is authorized to do business in the State of Georgia, including within this District.

37.    LNRS is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LNRS is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

38.    The information LNRS collects, maintains, and sells includes confidential details about insurance claims history on more than 200 million consumers. LNRS also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

39.    LNRS collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether LNRS collects and maintains information about them. Not only that, but consumers cannot remove information that LNRS collects and maintains about them from the CLUE database. Further, LNRS sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that LNRS sold.

## **JURISDICTION AND VENUE**

40.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

42.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

43.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

44.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

45. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

46. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### DEFENDANT'S PROCESSING OF CREDIT INFORMATION

47. Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

48. These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

49. Defendant collects information from thousands of furnishers.

50. The process by which Defendant receives, sorts, and stores information is largely electronic.

51.    Defendant takes insurance information reported by furnishers and creates consumer claims history files.

52.    Defendant takes credit information reported by furnishers and creates consumer credit files.

53.    Defendant maintains insurance claims history on more than 200 million consumers.

54.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts.

## DEFENDANT'S MIXED FILE PROBLEM

55.    Defendant knows that different consumers have similar names.

56.    Defendant knows that different consumers can have similar Social Security numbers.

57.    Defendant knows that different consumers with similar names can also have similar Social Security numbers.

58.    Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

59.    Defendant matches insurance claims and public records to a consumer file by comparing the information about the consumer associated with the insurance

claim or public record to the information they maintain about the consumer in the consumer's files.

60.    Defendant accomplishes this matching of insurance claims information to consumer files through the use of certain matching algorithms or database rules.

61.    From time to time, Defendant's matching algorithms match information belonging to one consumer to the file of another consumer; resulting in a mixed or merged credit file.

62.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

63.    Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's consumer report was still generated by Defendant containing information belonging to another consumer.

64.    A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and driving history and/or an entire claims history file belonging to one consumer into the claims history file of another consumer.

65.    There are many different possible causes for the mixing of consumer files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and consumer information, including public record information, to a particular consumers' file.

66.    The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the claims history information to Defendant.

67.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

68.    Accordingly, the database rules determine which files are selected by the algorithm and merged to create a complete consumer report.

69.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer files belonging to different consumers into one consumer report.

//

## FACTUAL ALLEGATIONS

### Plaintiff is Added to Her Partner's Automobile Insurance

70.    In July 2024, Plaintiff moved to Georgia to live with her partner. Prior to that, Plaintiff had only ever lived in Ohio.

71.    Accordingly, Plaintiff planned to register her vehicle in Georgia, and therefore, needed to update her automobile insurance.

72.    On or about August 11, 2024, Plaintiff and her partner decided to add Plaintiff to the Progressive insurance policy (the "Policy").

73.    To obtain a quote, Plaintiff provided Progressive with relevant information, such as accident history and previous claims. Plaintiff disclosed prior claims that belong to her, including one dated May 29, 2024 ("Plaintiff's Disclosed Claims").

74.    Upon inquiring into how much it would cost to add Plaintiff to her partner's insurance, Progressive's indicated that the Policy would increase by $22.95 per month.

75.    Plaintiff and her partner agreed that it made sense to add Plaintiff to the Policy and agreed to pay for it using a joint account that they both contribute to.

76.    Accordingly, Plaintiff and her partner began Plaintiff's application to add her to the Policy.

77.     As part of the application process, Progressive uses consumer reports to determine whether to approve consumer insurance applications and to determine the rate a consumer receives. Plaintiff provided Progressive with her personal identification information, including her Social Security number, and authorized it to obtain copies of consumer report including her automobile insurance claims history files. As Plaintiff had already disclosed her claims and automobile insurance history in obtaining her quote, she was not worried about providing this authorization.

78.     Upon information and belief, Progressive contracted with LexisNexis to obtain Plaintiff's credit information and requested a consumer report about Plaintiff from LexisNexis.

79.     On or about August 11, 2024, Defendant sold a consumer report about Plaintiff to Progressive in response to Plaintiff's application.

**Progressive Increases Plaintiff's Insurance Rate**

80.     On or about August 11, 2024, Progressive notified Plaintiff that the Policy premium would increase by $161.70 the next month.

81.     Plaintiff was floored. She did not understand how Progressive's initial quote of $22.95 a month had increased by nearly **600%** to $161.70, because the

accidents that Defendant was reporting did not involve Plaintiff at all or belong to her.

82.    Progressive's decision to charge Plaintiff more to be added to the Policy was based on CLUE reports published by Defendant about Plaintiff.

83.    Upon reviewing Progressive's notification, Plaintiff was confounded by the appearance of several pieces of information that did not belong to Plaintiff at all, including, but not limited to, four (4) *at fault* accidents dated:

(a)    May 30, 2019;

(b)    October 17, 2019;

(c)    April 12, 2022; and

(d)    February 22, 2023

(the "Accidents").

84.    Progressive also specifically requested that Plaintiff provide further details about the February 22, 2023, accident, and the April 12, 2022, accident.

85.    Defendant's reporting was grossly inaccurate: Plaintiff had not been in any accidents on those dates.

86.    The consumer file provided to Progressive by Defendant was patently false on its face because Defendant should not have sold a consumer report about Plaintiff containing the Accidents.

87.    By reporting the Accident's in the consumer file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's consumer files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's Dispute to Defendant August 2024**

88.    On or about August 11, 2024, worried that something was very wrong with her consumer file, Plaintiff called Defendant and disputed the inaccuracies. Specifically, Plaintiff disputed the Accidents, as well as three other claims, did not belong to her.

89.    Plaintiff explained that Defendant mixed Plaintiff with her twin brother.

90.    Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her consumer report.

91.    That same day, Plaintiff followed up her dispute call with an email and told Defendant she was happy to provide any additional information it needed to assist them in correcting its inaccurate reporting.

92.    While awaiting the dispute results, Plaintiff knew she had to insure her vehicle.

93.    Recognizing that she did not have much of a choice, and hopeful her dispute would rectify the issue, Plaintiff and her partner agreed to add her to the Policy.

94.    Because the amount was far more expensive than Plaintiff and her partner anticipated, Plaintiff covered the cost incurred of being added to the agreement in its entirety and sent the money to her Partner.

**Defendant's Unreasonable Dispute Reinvestigation**

95.    In September 2024, Defendant sent a dispute response, dated September 11, 2024, and provided Plaintiff with an updated consumer report.

96.    Upon reviewing the September 11, 2024, consumer report, Plaintiff was distressed to see that Defendant was still reporting information belonging to her brother, including the Accidents.

97.    Specifically, Defendant was still reporting the disputed Accidents, which do not belong to Plaintiff, and other inaccurate information which does not belong to Plaintiff:

      (a)    Name Variations:

          (1)  Basher Noor
          (2)  Noor Anwar Basher
          (3)  Noor A Basher

(b)    Addresses:

      (1)  Addyston, OH 45001

(c)    Phone Numbers:

      (1)  (513) 312-1128

      (2)  (513) 229-3158

(d)    Automobile Insurance Claim Records:

      (1)  Record 1: Anwar Basher
           Driver's License No.: XXXXX153
           Claim Number: 0547752048
           Date of Claim: 5/30/2019

      (2)  Record 2: Anwar Basher
           Driver's License No.: XXXXX153
           Claim Number: 0564906139
           Date of Claim: 10/17/20219

      (3)  Record 3: Anwar Basher
           Driver's License No.: XXXXX153
           Claim Number: 0665882742
           Date of Claim: 4/12/2022

      (4)  Record 4: Anwar Basher
           Driver's License No.: XXXXX153
           Claim Number: 0703818849
           Date of Claim: 2/22/2023

      (5)  Record 5: Anwar Basher
           Driver's License No.: XXXXX153
           Claim Number: 0756767000
           Date of Claim: 5/29/2024

(e)    Department of Driver Services Records:

(1) Record 2: Noor Basher Anwar

(2) Record 4: Noor Basher A
Driver's License Number: XXXXX252

(3) Record 5:
Driver's License Number: XXXXX2713

(f)    Driver's license violations:

(1) Record 1:
Court Case No.: 22D00584

(2) Record 2:
Court Case No.: 23TRD00324

(3) Record 3:
Court Case No.: 2022TRD00723

(4) Record 4:
Court Case No.: 22TRD27022

(5) Record 5:
BMW Case No.: LF24033828

(6) Record 6:
BMW Case No.: S123002071

(7) Record 7:
Departmental Violation
Incident Date: 6/11/2023

(8) Record 8:
Ticket No.: OHP140521090420191812
Case No.: TRD1904367
Case File Date: 2019090

(9) Record 9:

Ticket No.: M086965
Case No.: 18TRD02604
Case File Date: 20180502

(10)  Record 10:
Ticket No.: OHP830471022220220013
Case No.: 22TRD00584
Case File Date: 20220222

(g)  Miscellaneous details:

(1)  Record 2:
REMEDIAL TWO POINT CREDIT - COURSE COMPL
ETED: 20230603

(h)  Driver's license records:

(1)  Record 2: Noor Anwar Basher

(2)  Record 3: Noor Anwar Basher

(3)  Record 4: Noor Anwar Basher

(4)  Record 6: Noor Anwar Basher

(5)  Record 8: Noor Anwar Basher

(6)  Record 10: Noor Anwar Basher

(7)  Record 11: Noor Anwar Basher

98.    In response to Plaintiff's August 2024 dispute, Defendant failed to delete the information disputed by Plaintiff.

99.    Defendant failed to conduct a reasonable investigation of Plaintiff's August 2024 dispute, or any reinvestigation whatsoever, to determine whether the

disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

100.   Thereafter, Defendant failed to unmix Plaintiff's consumer file from that of Plaintiff's brother and likely Defendant continued to report Plaintiff's brother's information to Plaintiff's consumer file.

101.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

102.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by the reporting of negative driving records and insurance claims; loss of ability to purchase and benefit from her good driving record and claims history; detriment to her driving record and claims history; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of increased insurance policy rates and having another consumer's personally identifying information, driving records, and claims history, mixed into Plaintiff's claims history file.

**Plaintiff's Mixed File as of October 2024**

103.    Shocked, worried, and confused, to see even more additional accurate information than she initially thought, Plaintiff requested a copy of her consumer file from Defendant again in October 2024.

104.    On or about October 28, 2024, Plaintiff obtained a copy of her consumer file from Defendant.

105.    Upon reviewing the contents of the October 28, 2024, consumer file, Plaintiff was distressed to see that Defendant was still reporting information belonging to her brother.

**Plaintiff Sustained Damages as a Result of LexisNexis' Inaccurate Reporting**

106.    As a result of Defendant's conduct, Plaintiff sustained severe emotional distress. Specifically, Plaintiff has spent an inordinate amount of time dealing with the stress and anxiety caused by the false reporting from Defendant.

107.    Plaintiff has suffered from countless nights of poor sleep, no sleep, or interrupted sleep as her mind frequently drifts to thoughts of the issues with Defendant's reporting about her, future issues caused by Defendant, and/or other related matters.

108.   Plaintiff has spent countless hours trying to correct her LexisNexis consumer file as well as rectify the rate of her insurance Policy and suffered an enormous amount of stress associated with the inaccurate reporting.

109.   Plaintiff was anxious and frustrated because she did not know how to correct her LexisNexis report.

110.   Upon information and belief, because Defendant continues to mix Plaintiff's consumer file with that of her twin brother, Defendant continues to sell Plaintiff's consumer file in response to applications and inquiries pertaining to her brother.

111.   As a result of the "mixed file," Defendant cost Plaintiff to incur costs she otherwise would not have incurred.

112.   At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

113.   At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

114.   As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

115.   Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

116.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by the reporting of negative driving records and insurance claims; loss of ability to purchase and benefit from her

good driving record and claims history; detriment to her driving record and claims history; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of increased insurance policy rates and having another consumer's personally identifying information, driving records, and claims history, mixed into Plaintiff's claims history file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant LNRS)

117.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

118.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

119.   On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

120.   Defendant mixed another consumer's personal and credit account information into Plaintiff's consumer file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's insurability.

121.   Defendant LNRS violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports and claims history files it published and maintained concerning Plaintiff.

122.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by the reporting of negative driving records and insurance claims; loss of ability to purchase and benefit from her good driving record and claims history; detriment to her driving record and claims history; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of increased insurance policy rates and having another consumer's personally

identifying information, driving records, and claims history, mixed into Plaintiff's claims history file.

123.   Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

124.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation
## (Second Claim for Relief Against Defendant LNRS)

125.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

126.   The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

127. The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

128. Plaintiff initiated a dispute with Defendant and disputed inaccurate information reporting in her claims history file and requested that Defendant correct and/or delete the inaccurate, misleading, and highly damaging information belonging to a different consumer.

129. Defendant failed to correct Plaintiff's report in response to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's claims history file.

130. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's consumer files.

131.  As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by the reporting of negative driving records and insurance claims; loss of ability to purchase and benefit from her good driving record and claims history; detriment to her driving record and claims history; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of increased insurance policy rates and having another consumer's personally identifying information, driving records, and claims history, mixed into Plaintiff's claims history file.

132.  Upon information and belief, Defendant knew or should have known about its obligations under the FCRA. These obligations are well-established in the plain language of the FCRA, promulgations made by the Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB), and in well-established case law.

133.  Therefore, Defendant acted consciously in failing to adhere to its obligations under the FCRA.

134.    Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

135.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 27th day of December 2024.

By: */s/ Jenna Dakroub*
Jenna Dakroub, GA #385021
**CONSUMER JUSTICE LAW FIRM PLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerjustice.com

**CONSUMER JUSTICE LAW FIRM PLC**
8095 N. 85th Way
Scottsdale, AZ 85258

*Attorneys for Plaintiff,*
*Noorah Basher*

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER JUSTICE LAW FIRM PLC**

By: */s/ Jenna Dakroub*